UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:25-cr-00091-CCB |
| | ) | |
| MATTHEW J. KAWA (01), | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

The government now files its Sentencing Memorandum for Mr. Matthew Kawa. Based on the below considerations, the government respectfully suggests a sentence at the low end of the guideline range—namely 70 months in prison—followed by a suitable term of supervised release.

## I. Sentencing Guideline Calculation

The Final PSR calculates a Total Offense Level of 27 and a Criminal History Category of I, for a guideline range of 70 to 87 months in prison. See PSR ¶124 (ECF 51). The defense objects to this calculation, arguing that the enhancement for the conscious or reckless risk of death or serious bodily injury does not apply. See Addendum, ECF 52.

The government disagrees. As the government explains in the Addendum, the enhancement is appropriate if there is a conscious or reckless risk of serious bodily injury. As the Seventh Circuit observed in *United States*

*v. Babul*, 476 F.3d 498 (7th Cir. 2007), fraud crimes normally involve only financial injury, but "[w]hen a fraud creates the risk of physical injury or death, a longer sentence is appropriate." *Id.* at 503; *see also United States v. Zeedyk*, No. 22-cr-85-DRL (N.D. Ind. Sep. 20, 2024), at ECF 82 (applying the enhancement for a defendant who sold a mislabeled ethanol product).

The enhancement is appropriate even where there is no actual injury. In *United States v. Redman*, 887 F.3d 789, 794-95 (7th Cir. 2018), the Seventh Circuit affirmed the enhancement due to the riskiness of the defendant's behavior in making prescriptions to patients without training.

Here, Mr. Kawa had a business, Paradigm Peptides, that sold SARMs, peptides, and other unapproved drugs for human consumption. Many of the drugs sold by Paradigm carried a risk of death or serious bodily injury. See Gov. Ex. 6-8 (describing various Paradigm products and their health risks).

The FDA currently has prominent warnings about the dangers associated with SARMs, and has been issuing such warnings since at least October 2017. Gov. Ex. 1, Ex. 2. In December 2020, Paradigm was directly put on notice by the FDA by means of a letter warning about peptide Thymosin Alpha 1. Gov. Ex. 3, p.5. A second warning letter by the FDA was sent to Paradigm in March 2022. *Id.*, p.1. The health risk of these drugs is the very reason why criminal law prohibits the unapproved marketing and sale for human consumption. Mr. Kawa and his sister Ms. Stechkober ignored these

warnings and continued selling the products. Because they had been advised of the risks of SARMs and other unapproved drugs, were aware of these risks, and yet continued selling and distributing unapproved drugs, they acted consciously and recklessly.

The serious risk of the offense is compounded by the fact that many of the SARM products sold by Paradigm were not what they purported to be, but instead were actually testosterone. All six different SARM products obtained by the government during its investigation tested as testosterone and not as the SARM it was labeled to be. One of the victims tested his own SARM purchase, and it also turned out to be testosterone. Gov. Ex. 6-4. Testosterone is a Schedule III controlled substance and has serious health side effects. Gov. Ex. 4. Ingesting testosterone without the oversight of a medical professional carries a risk of serious bodily injury—and ingesting testosterone unknowingly while thinking that it is a completely different substance makes the risk even more pronounced.

Mr. Kawa explained to investigators that some of his SARM products came from China, and that he did not know that they were testosterone. But this does not absolve Mr. Kawa and Ms. Stechkober from any blame. To the contrary, this demonstrates the recklessness of their behavior, as they did not test the products they obtained from China—while at the same time, falsely representing to customers that Paradigm products were of high quality and

purity, that Paradigm had a relationship with the FDA, and that its products had been manufactured and tested in the United States.

It should be noted that the enhancement applies in cases where there is only a risk of serious injury, even if there is no proof of actual injury. *See Redman*, 887 F.3d at 795. But in this case, there are victims who claim that they suffered serious bodily injuries after ingesting Paradigm products, including at least one victim who enlisted a medical professional to review the victim's medical history. See Gov. Ex. 6. That medical professional concluded that the victim suffered serious medical problems as a result of taking the Paradigm products. Thus the Guidelines correctly apply the enhancement for risk of serious bodily injury.

## II. Section 3553(a) Factors

Because the Court must address and balance the factors identified by Congress in Title 18, United States Code, Section 3553(a), the government offers the following observations as to some of those factors.

### A. Nature and Circumstances of the Offense

As noted above, Mr. Kawa was the owner of an online business that marketed and sold drugs and supplements that were not approved by the FDA. His sister Ms. Stechkober was the primary employee who assisted in running the business.

On the website, Paradigm was marketed as an "American-owned small business providing loyal customers with the highest quality products and service." Gov. Ex. 7, p.1. The website claimed that the the products were "exceptional"; that they were "the highest quality, safest products on the market"; that all products were "tested to verify authenticity and purity"; that the products were "pharmaceutical grade". *Id.*, p.2. The website claimed that Paradigm had "laboratories based out of Tennessee with its manufacturing and distribution based in the Midwest" and that it was the "only manufacturer" to remove a certain compound "ensuring quality pharmaceutical grade products for our customers." *Id.*, p.3. All of these representations were false: the Paradigm products were not manufactured in the United States but were shipped from Asia, and Paradigm did not test its products for quality and purity. Other false representations on its website or in emails to customers included that Paradigm was licensed and registered with the FDA, when it actually had no relationship with the FDA. Paradigm also forged Certificates of Analysis for its products, by editing the information and watermarks on other businesses' Certificates of Analysis and taking off the third-party contact information for the lab that the report came from, so that customers could not call the lab about the report. These false representations induced customers to buy Paradigm products, as they believed the products were of high quality, as several of the victims note in their impact statements.

The scope of Mr. Kawa's business was significant, operating from at least 2019 to March 2024, when it was shut down after the federal investigators executed a warrant on the business. The government estimates that more than 54,000 unique purchasers made more than 92,000 orders of Paradigm products. When just considering the SARM products, the government estimates that there were more than 31,000 unique purchaser emails that made more than 48,000 orders of SARMs.

The Paradigm business made millions of dollars in sales. Some of the shipping records obtained during the investigation appeared to indicate that more than $10 million in sales occurred during the operation of the business. Other website records appeared to give smaller figures when describing the total sales. Mr. Kawa also explained to investigators that he used third-party processing businesses which received all the money paid by customers and which processed the sales, with the third-party processors periodically transferring the customers' money to Paradigm's bank accounts after keeping a percentage of the sales money as its service fees. The parties have recognized that it is not possible to reach an exact calculation of the total amount of money paid by customers for Paradigm products, nor an exact calculation of the total amount of proceeds that Mr. Kawa derived from the Paradigm business. Accordingly, the parties have reached a reasonable and good-faith estimate that Mr. Kawa derived proceeds of at least $5 million.

Mr. Kawa's offense is calculated under the guidelines for fraud crimes, and because he obtained at least $5 million in proceeds, there is a significant loss amount enhancement. But the offense was not just a financial injury to the customers who spent money on a product that was falsely marketed. The purchased products endangered the health of customers. Many have submitted impact statements, reporting a wide range of effects from taking Paradigm products, including skin irritation and chronic acne; drops in natural testosterone levels, requiring continued medical treatment and testosterone replacement therapy; stress, anxiety, depression, and mood swings, even suicidal ideation.

Over the course of the investigation, government investigators have attempted to contact every customer, but with some significant difficulty. Only a small fraction of the customers have responded with a restitution request or an impact statement. This is not surprising—it would be difficult for a particular customer to link his or her negative health effects to a mislabeled Paradigm product. This means that as long as there are Paradigm products in people's homes, there will continue to be an ongoing risk to consumers of Paradigm products.

Mr. Kawa also committed the offense of importing merchandise contrary to law. One of the products sold by Paradigm was HCG (Human chorionic gonadotropin), which was obtained from India. Over the course of at least 3

years, Mr. Kawa received many notices that the HCG parcels that were misbranded drugs and not in compliance with the law, and thus had been stopped at the border. Despite these warnings, Mr. Kawa continued to import these parcels into the United States, including having the parcels delivered at a rotating set of addresses in an attempt to avoid government scrutiny.

To his credit, Mr. Kawa has accepted responsibility for his offense, as he pleaded guilty in a timely manner. He also voluntarily met with investigators following his guilty plea to explain his offense and to offer information about the SARM/peptide market. The guideline calculation appropriately recognizes a 3-level acceptance-of-responsibility reduction.

**B. History and Characteristics of the Defendant**

Mr. Kawa is 48 years old. Based on the PSR, he has three misdemeanor convictions that do not count for any criminal history points. He worked as a car mechanic before starting his Paradigm business around 2018. He has been unemployed since Paradigm closed after the search warrant execution in March 2024. He is married with a wife and young daughter in the Philippines.

**C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence to Criminal Conduct**

Mr. Kawa's sentence needs to reflect the seriousness of the offense and to provide just punishment for the offense. In addition, Mr. Kawa's sentence must be serious enough to deter others from engaging in white-collar crime of

this nature. In *United States v. Brown*, 880 F.3d 399 (7th Cir. 2018), the Seventh Circuit found that the district court did not err in concluding that a high sentence for health care fraud was needed to meet the goal of general deterrence because white-collar criminals tend to "engage in cost-benefit analyses in deciding whether to engage in illicit activities," and those who engage in complex fraud crimes have "a low probability of getting caught." *Id.* at 405. The *Brown* court continued:

> We previously have endorsed the idea that white-collar criminals "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860–61 (7th Cir. 2015). They are, therefore, "prime candidates for general deterrence." *Id.* at 860 (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)). Our approach comports with that of our sister circuits. *See United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quoting *Peppel*, 707 F.3d at 637)); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (using language identical to that in *Musgrave*); *cf. United States v. Goffer*, 721 F.3d 113, 132, 531 Fed. Appx. 8 (2d Cir. 2013) (noting that "high sentences" were necessary to alter the calculus "that insider trading 'was a game worth playing'").

*Id.*; *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that a lenient sentence for a white-collar offender was inconsistent with the purposes of § 3553 and the Sentencing Guidelines and noting that there is a "critical deterrent value [in] imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit

another offense").

This concern for general deterrence is especially applicable to the type of offense committed by Mr. Kawa. Health and body-building supplements is a multi-billion dollar industry in the United States, and there is a strong incentive to sell such products and make money—and if done illegally and outside the oversight of government regulators, this will be at the expense of the health and safety of the public.

## III. Restitution and Forfeiture

In his plea agreement, Mr. Kawa agreed to pay restitution to the victims of his offense. The government has received restitution requests from 167 victims, for a total restitution amount of $77,155.57.

The government and the defense estimates that Mr. Kawa obtained $5 million in proceeds from the commission of his offense. To his credit, Mr. Kawa has agreed to the entry of a personal money judgment in the amount of $5 million. On June 15, 2026, this Court entered an order of forfeiture for that amount, which should be made final at the time of sentencing. ECF 39.

In light of the financial obligations for restitution and the money judgment forfeiture, the government recommends no fine.

## IV. Conclusion

For the above reasons, the government respectfully recommends a sentence at the low end of the guideline range—namely, 70 months in prison,

followed by a suitable period of supervised release.

Dated: July 16, 2026

Respectfully submitted,

ADAM L. MILDRED
UNITED STATES ATTORNEY

BY: */s/Luke N. Reilander*

Luke N. Reilander
Assistant United States Attorney
United States Attorney's Office
204 S. Main Street, Room M01
South Bend, IN 46601
Tel: (574) 236-8287
Fax: (574) 236-8155
E-mail: luke.reilander@usdoj.gov