UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:25-cr-00091-CCB |
| | ) | |
| JENNIFER L. STECHKOBER (02), | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

The government now files its Sentencing Memorandum for Ms. Jennifer Stechokber. Based on the below considerations, the government respectfully suggests a sentence of 36 months in prison, followed by a suitable term of supervised release.

## I. Sentencing Guideline Calculation

The Final PSR calculates a Total Offense Level of 25 and a Criminal History Category of 1, for a guideline range of 57 to 71 months in prison. See PSR ¶108 (ECF 48). The maximum possible sentence under the statute, however, is 36 months.

The defense objects to this calculation, arguing that the enhancement for the conscious or reckless risk of death or serious bodily injury does not apply. See Addendum, ECF 49.

The government disagrees. As the government explains in the Addendum, the enhancement is appropriate if there is a conscious or reckless risk of serious bodily injury. As the Seventh Circuit observed in *United States v. Babul*, 476 F.3d 498 (7th Cir. 2007), fraud crimes normally involve only financial injury, but "[w]hen a fraud creates the risk of physical injury or death, a longer sentence is appropriate." *Id.* at 503; *see also United States v. Zeedyk*, No. 22-cr-85-DRL (N.D. Ind. Sep. 20, 2024), at ECF 82 (applying the enhancement for a defendant who sold a mislabeled ethanol product).

The enhancement is appropriate even where there is no actual injury. In *United States v. Redman*, 887 F.3d 789, 794-95 (7th Cir. 2018), the Seventh Circuit affirmed the enhancement due to the riskiness of the defendant's behavior in making prescriptions to patients without training.

Here, Ms. Stechkober was the principal employee at a business, Paradigm Peptides, that sold SARMs, peptides, and other unapproved drugs for human consumption. Many of the drugs sold by Paradigm carried a risk of death or serious bodily injury. See Gov. Ex. 6-8 (describing various Paradigm products and their health risks).

The FDA currently has prominent warnings about the dangers associated with SARMs, and has been issuing such warnings since at least October 2017. Gov. Ex. 1, Ex. 2. In December 2020, Paradigm was directly put on notice by the FDA by means of a letter warning about peptide Thymosin

Alpha 1. Gov. Ex. 3, p.5. A second warning letter by the FDA was sent to Paradigm in March 2022. *Id.*, p.1. The health risk of these drugs is the very reason why criminal law prohibits the unapproved marketing and sale for human consumption. Ms. Stechkober and the owner of the business, her brother Mr. Kawa, ignored these warnings and continued selling the products. Because they had been advised of the risks of SARMs and other unapproved drugs, were aware of these risks, and yet continued selling and distributing unapproved drugs, they acted consciously and recklessly.

The serious risk of the offense is compounded by the fact that many of the SARM products sold by Paradigm were not what they purported to be, but instead were actually testosterone. All six different SARM products obtained by the government during its investigation tested as testosterone and not as the SARM it was labeled to be. One of the victims tested his own SARM purchase, and it also turned out to be testosterone. Gov. Ex. 6-4. Testosterone is a Schedule III controlled substance and has serious health side effects. Gov. Ex. 4. Ingesting testosterone without the oversight of a medical professional carries a risk of serious bodily injury—and ingesting testosterone unknowingly while thinking that it is a completely different substance makes the risk even more pronounced.

Mr. Kawa explained to investigators that some of his SARM products came from China, and that he did not know that they were testosterone. But

this does not absolve Mr. Kawa and Ms. Stechkober from any blame. To the contrary, this demonstrates the recklessness of their behavior, as they did not test the products they obtained from China—while at the same time, falsely representing to customers that Paradigm products were of high quality and purity, that Paradigm had a relationship with the FDA, and that its products had been manufactured and tested in the United States.

It should be noted that the enhancement applies in cases where there is only a risk of serious injury, even if there is no proof of actual injury. *See Redman*, 887 F.3d at 795. But in this case, there are victims who claim that they suffered serious bodily injuries after ingesting Paradigm products, including at least one victim who enlisted a medical professional to review the victim's medical history. See Gov. Ex. 6. That medical professional concluded that the victim suffered serious medical problems as a result of taking the Paradigm products. Thus the Guidelines correctly apply the enhancement for risk of serious bodily injury.

## II. Section 3553(a) Factors

Because the Court must address and balance the factors identified by Congress in Title 18, United States Code, Section 3553(a), the government offers the following observations as to some of those factors.

### A. Nature and Circumstances of the Offense

As noted above, Ms. Stechkober was the primary employee of an online business that marketed and sold drugs and supplements that were not approved by the FDA.

On the website, Paradigm was marketed as an "American-owned small business providing loyal customers with the highest quality products and service." Gov. Ex. 7, p.1. The website claimed that the the products were "exceptional"; that they were "the highest quality, safest products on the market"; that all products were "tested to verify authenticity and purity"; that the products were "pharmaceutical grade". *Id.*, p.2. The website claimed that Paradigm had "laboratories based out of Tennessee with its manufacturing and distribution based in the Midwest" and that it was the "only manufacturer" to remove a certain compound "ensuring quality pharmaceutical grade products for our customers." *Id.*, p.3. All of these representations were false: the Paradigm products were not manufactured in the United States but were shipped from Asia, and Paradigm did not test its products for quality and purity. Other false representations on its website or in emails to customers included that Paradigm was licensed and registered with the FDA, when it actually had no relationship with the FDA. Paradigm also forged Certificates of Analysis for its products, by editing the information and watermarks on other businesses' Certificates of Analysis and taking off the third-party contact information for the lab that the report came from, so

that customers could not call the lab about the report. These false representations induced customers to buy Paradigm products, as they believed the products were of high quality, as several of the victims note in their impact statements.

The scope of the Paradigm business was significant, operating from at least 2019 to March 2024, when it was shut down after the federal investigators executed a warrant on the business. The government estimates that more than 54,000 unique purchasers made more than 92,000 orders of Paradigm products. When just considering the SARM products, the government estimates that there were more than 31,000 unique purchaser emails that made more than 48,000 orders of SARMs.

The Paradigm business made millions of dollars in sales (although Ms. Stechkober appears to have been paid a normal salary, while her brother pocketed most of the income). Some of the shipping records obtained during the investigation appeared to indicate that more than $10 million in sales occurred during the operation of the business. Other website records appeared to give smaller figures when describing the total sales. Mr. Kawa also explained to investigators that he used third-party processing businesses which received all the money paid by customers and which processed the sales, with the third-party processors periodically transferring the customers' money to Paradigm's bank accounts after keeping a percentage of the sales

money as its service fees. The parties have recognized that it is not possible to reach an exact calculation of the total amount of money paid by customers for Paradigm products, nor an exact calculation of the total amount of proceeds that were derived from the Paradigm business. Accordingly, the parties have reached a reasonable and good-faith estimate that there were at least $5 million in proceeds from the business.

Mr. Stechkober's offense is calculated under the guidelines for fraud crimes. Because there is a loss of at least $5 million, there is a significant loss amount enhancement in the guidelines calculation. But the offense was not just a financial injury to the customers who spent money on a product that was falsely marketed. The purchased products endangered the health of customers. Many have submitted impact statements, reporting a wide range of effects from taking Paradigm products, including skin irritation and chronic acne; drops in natural testosterone levels, requiring continued medical treatment and testosterone replacement therapy; stress, anxiety, depression, and mood swings, even suicidal ideation.

Over the course of the investigation, government investigators have attempted to contact every customer, but with some significant difficulty. Only a small fraction of the customers have responded with a restitution request or an impact statement. This is not surprising—it would be difficult for a particular customer to link his or her negative health effects to a

mislabeled Paradigm product. This means that as long as there are Paradigm products in people's homes, there will continue to be an ongoing risk to consumers of Paradigm products.

To her credit, Ms. Stechkober has accepted responsibility for her offense, as she pleaded guilty in a timely manner. The guideline calculation appropriately recognizes a 3-level acceptance-of-responsibility reduction.

**B. History and Characteristics of the Defendant**

Ms. Stechkober is 31 years old. Based on the PSR, she has a pending misdemeanor charge and a previous misdemeanor conviction that do not count for any criminal history points. Ms. Stechkober is a military veteran, with a variety of medical issues.

**C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence to Criminal Conduct**

Ms. Stechkober's sentence needs to reflect the seriousness of the offense and to provide just punishment for the offense. In addition, Ms. Stechkober's sentence must be serious enough to deter others from engaging in white-collar crime of this nature. In *United States v. Brown*, 880 F.3d 399 (7th Cir. 2018), the Seventh Circuit found that the district court did not err in concluding that a high sentence for health care fraud was needed to meet the goal of general deterrence because white-collar criminals tend to "engage in cost-benefit analyses in deciding whether to engage in illicit activities," and those who

engage in complex fraud crimes have "a low probability of getting caught." *Id.* at 405. The *Brown* court continued:

> We previously have endorsed the idea that white-collar criminals "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860–61 (7th Cir. 2015). They are, therefore, "prime candidates for general deterrence." *Id.* at 860 (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)). Our approach comports with that of our sister circuits. *See United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quoting *Peppel*, 707 F.3d at 637)); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (using language identical to that in *Musgrave*); *cf. United States v. Goffer*, 721 F.3d 113, 132, 531 Fed. Appx. 8 (2d Cir. 2013) (noting that "high sentences" were necessary to alter the calculus "that insider trading 'was a game worth playing'").

*Id.*; *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that a lenient sentence for a white-collar offender was inconsistent with the purposes of § 3553 and the Sentencing Guidelines and noting that there is a "critical deterrent value [in] imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense").

Ms. Stechkober's offense is certainly not as serious as Mr. Kawa's, whose guidelines are enhanced based on his role as an organizer and leader. But she was a central participant in running the business. In addition, she knowingly made many false representations to customers who inquired about products by

email and to the FDA when it sent warnings to Paradigm. Her guideline range is above the statutory maximum sentence authorized by the offense she pleaded guilty to. Accordingly, the government recommends a sentence of 36 months.

## III. Restitution

In her plea agreement, Ms. Stechkober agreed to pay restitution to the victims of her offense. The government has received restitution requests from 167 victims, for a total restitution amount of $77,155.57. Restitution judgment should be imposed jointly and severally with Mr. Kawa.

The government recommends no fine.

## IV. Conclusion

For the above reasons, the government respectfully recommends a sentence of 36 months in prison, followed by a suitable period of supervised release.

/

/

/

/

/

/

Dated: July 16, 2026

Respectfully submitted,

ADAM L. MILDRED
UNITED STATES ATTORNEY

BY: */s/Luke N. Reilander*
Luke N. Reilander
Assistant United States Attorney
United States Attorney's Office
204 S. Main Street, Room M01
South Bend, IN 46601
Tel: (574) 236-8287
Fax: (574) 236-8155
E-mail: luke.reilander@usdoj.gov